## BRANTON v. INKS et al.
### No. 9011.

Court of Civil Appeals of Texas. Austin.
March 19, 1941.

Rehearing Denied April 9, 1941.

Harris & Harris, of Austin, for appellant.

Shelton & Shelton, of Austin, for appellee.

BLAIR, Justice.

Appellee, Mrs. Nellie Inks, individually and as next friend of her husband, J. M. Inks, alleged to be of unsound mind, sued appellant, J. B. Branton, to cancel and rescind certain deeds and instruments of conveyance alleging that their execution was procured by fraud practiced by appellant upon J. M. Inks and with notice that he was of unsound mind at all times in question. In the alternative, appellee sued

for both actual and exemplary damages alleged to have resulted under the facts from the several conveyances. J. M. Inks died after the suit was filed; and before the trial appellee filed her third amended original petition, wherein she continued her suit individually and also sued as community survivor and sole legatee under the will of J. M. Inks, deceased, and as independent executrix of his estate. A trial to a jury upon special issues resulted in judgment for appellee as hereinafter described; hence this appeal.

On April 23, 1936, by warranty deed J. M. Inks conveyed to appellant, J. B. Branton, lots 2 and 4 in Block 3, Outlot 5, Division Z of the City of Austin, together with a dwelling house thereon. Appellant testified that the market value of this property was $1,200 at the time. He assumed and later paid off an indebtedness of $325 against this property. As consideration he deeded to J. M. Inks a house and lot on the Manchaca Road near the city limits of Austin. He testified that the market value of this property was $500 or $600 at the time.

Shortly after this trade was made Inks traded the Manchaca Road property for 20 acres of land near Carrizo Springs. Inks deeded this property to a friend as a gift. The friend destroyed the deed, and testified that Inks was of unsound mind; that he went with Inks to see the 20 acres, but if it existed it was enclosed in a 60,000-acre ranch. The jury found that the difference between the value of the property traded Branton and the property Branton traded to Inks was $470 at the time. The jury further found that the exchange of the properties was procured by the fraud of Branton; that Inks was of unsound mind at the time; and that Branton knew of his unsoundness of mind. Upon these findings of the jury, judgment was rendered cancelling and rescinding the deed and conveyance to Branton, the court further finding and decreeing that since Inks was of unsound mind, and since Branton knew of his unsoundness of mind, no tender of the property received by Inks in the trade was required.

On May 1, 1936, J. M. Inks and his wife, Nellie Inks, by warranty deed conveyed to appellant, J. B. Branton, their homestead in Austin, being the south 34 feet of Lot 9 and all of Lots 8 and 10 of Block 8 of the Christian & Fellman Addition to the City of Austin. This property was a five-unit apartment house. Mr. and Mrs. Inks lived in one unit and rented the other four units for a total monthly rental of $100, and with the exception of only a few months vacancy in two or three of the units, the property had been so rented for ten years next preceding the conveyance to appellant. There was an H.O.L.C. loan on this property of $4,000, which appellant assumed, and $300 back taxes which appellant assumed and paid. As additional consideration, the homestead was leased to Inks for five years at a rental of $25 per month. As further consideration, appellant deeded Inks a house and lot in Weslaco, Branton agreeing to pay the back taxes, which he represented to be $280, and which amount he paid Inks in cash. Inks was shown a picture of the house made several years prior to the transaction. Meantime a storm had severely wrecked the house and garage. Inks traded this property to one Wende, who paid the back taxes and found them to be $660 instead of $280. Other evidence showed that Inks realized about $1,140 for the property; and that its value was $1,400 or $1,500. A disinterested realtor testified that the Inks' homestead had a reasonable market value of $9,750 on May 1, 1936. The jury found that the difference between the value of the property Inks traded to Branton and the property Branton traded to Inks was $1,542. The jury further found that the trade or exchange of these properties was procured by the fraud of Branton; that Inks was of unsound mind at the time, and that Branton knew of his unsoundness of mind at the time. Upon these findings, and the further findings of defective acknowledgment to the deed, and coercion of Mrs. Inks in securing her signature thereto, judgment was rendered cancelling and rescinding this conveyance, and the court decreeing that under such facts no tender of the property received by Inks in the trade was required.

On June 18, 1937, appellant, Branton, purchased the leasehold interest of the Inkses, together with the furniture in four of the units of the apartment house, for the sum of $1,000, and took possession of the homestead. This conveyance was in the nature of a quitclaim deed, signed and acknowledged by both Mr. and Mrs. Inks. At the time the lease had almost four years to run, and was shown to have had a reasonable net rental value of $75 or $85 per month. The jury found that this transac-

tion was induced by the fraud of appellant, Branton; that Inks was of unsound mind, and that Branton knew of his unsoundness of mind at the time. The jury further found that the furniture was of the value of $800; and that the reasonable rental value of the premises since appellant took possession was $1,250. The court found that this transaction could not be equitably cancelled or rescinded, and rendered judgment for the amount of these two items, aggregating $2,050.

A receiver was appointed to rent and care for the properties pending this litigation.

Appellant states that his "brief consists largely of complaints at the evidence as insufficient to support the findings of the jury" with respect to the fraud of Branton, the unsoundness of the mind of Inks, and that Branton knew of the unsoundness of the mind of Inks at the time of the three transactions. These contentions are presented by propositions 1, 4, 8 and 9. We will review first the sufficiency of the evidence on the issues of unsoundness of mind of Inks and Branton's knowledge thereof at the time of the transactions involved.

■ The first deed in question was executed by J. M. Inks alone to appellant Branton on April 23, 1936; the second deed was executed by J. M. Inks and his wife, appellee, on May 1, 1936; and the quitclaim deed or sale of the balance of the 5-year leasehold estate and the furniture was executed by both Mr. and Mrs. Inks on June 18, 1937. Thus the transactions covered a period of about fourteen months. At the time of the first deed J. M. Inks was 78 or 79 years of age and Mrs. Inks was about 75 years of age. J. M. Inks had been engaged in the real estate business in Austin for some thirty years, and seems to have been associated in business with a son, Roy Inks, but for how long the record does not show. In the spring of 1935, Roy Inks died, and J. M. Inks became very despondent, declaring that there was nothing left in life for him. In the latter part of 1935, or the early part of 1936, J. M. Inks suffered what the witnesses described as a stroke. Dr. C. H. Brownlee, the family physician, a distant relative of Mrs. Inks, and a friend of long standing, was called, and he testified that J. M. Inks was suffering of a stroke of epilepsy and was delirious; that he had Bright's disease, hardening of the arteries, and high blood pressure, and that as a result of these diseases his brain was not getting the proper nourishment. He further testified that Inks suffered other strokes of epilepsy or paralysis prior to his death, which occurred January 5, 1938; and that from the early part of 1936 until his death he was of unsound mind and did not have sufficient mentality to understand the nature of any of the three transactions here involved. He further testified that one suffering as Inks was might execute the transactions, but still have no recollection of them; and that after his first stroke witness would meet Inks on the street and would not be recognized by him until he told Inks who he was, although Inks had known him intimately all of witness's life.

Dr. R. E. Cloud, a mental specialist who operates the Oaks Sanitarium near Austin for mental and nervous cases, testified that several years prior to the transactions in question he treated J. M. Inks at his sanitarium on two occasions for alcoholism; that in the summer of 1937 he met Inks on the street and that his mind seemed "to be dazed," but not from alcoholism; and that he did not have sufficient mentality to "understand the nature of a trade wherein he was selling his home, or leasing his home for $1,000, and selling his furniture and moving away."

The wife, daughter, and friends of J. M. Inks testified to the change in his mind after the death of his son, and particularly after his first stroke; that he seemed to be obsessed with the idea that there was nothing left in life for him; that he should dispose of his property and get a pension; that he sat on his porch and constantly talked of imaginary large real estate deals he was making; that when he drove his car he would forget where he left it; that after he moved from the home place he did not know why; and that his mental condition grew continuously worse after he had his first stroke, about the first of the year 1936.

Inks was described as an able realtor, but traded for the Weslaco property without seeing it, the trade being made with Branton, who testified that he had known Inks only a short time before the first trade was made. He then traded this property for other property without seeing it, and after being told that such property had been "storm wrecked." He traded the Manchaca Road property for twenty acres of land near Carrizo Springs without see-

ing it; but told his friend that it was worth $5,000, and deeded it to his friend as a gift. The friend destroyed the deed, believing that Inks was of unsound mind; that he went with Inks to see the twenty acres, but if it existed it was enclosed in a 60,000-acre ranch.

This was sufficient evidence to support the findings of the jury that J. M. Inks was of unsound mind at the time he made each of the three transactions involved here.

The jury could have also reasonably inferred from the following facts and circumstances that Branton knew of the unsoundness of the mind of Inks at the time of each of the three transactions. Branton testified that he did not know Inks until he came to his office in the early part of 1936. He told Branton that he wanted to dispose of his property so that he would be eligible for a pension, or Branton told him that he would not be eligible unless he disposed of his property. Branton knew that Inks was a realtor; that Inks told him he would take his word as to the value and condition of the Weslaco property; and that another reason for selling the homestead was that his married children were constantly coming in and "eating him out of house and home." This was shown to be untrue; and to the contrary that the four apartments not occupied by the Inkses had been rented for ten years with only a few months vacancy, during which time a son rented one unit for a short time and paid rent as did others. The advantage to Branton as found by the jury was more than one-third of the value of the first piece of property traded to him by Inks; nearly one-third of the value of the homestead interest of Inks; and for the leasehold estate of nearly four years valued at from $75 to $85 per month net, and the household furniture valued by the jury at $800, Branton paid Inks $1,000. Thus appellant obtained the leasehold estate valued at more than $3,000 for $200.

The daughter of Inks testified that she went to Branton's office for her father shortly before her father had to move from the home place, which was either shortly before or shortly after he executed the sale of the leasehold estate and furniture, and told Branton that her father was not supposed to be out alone, and that he was not capable of transacting any business.

The personal appearance of Inks was described as being broken up or despondent. Dr. Cloud testified that in August, 1937, after he executed the quitclaim deed and sale of the furniture on June 8, 1937, Inks appeared to be "dazed"; and that he regarded him as being of unsound mind. His family physician testified that Inks for sometime prior to his death was despondent and did not recognize him when they met on the street; that he was of unsound mind when he executed each of the three instruments; and was not capable of knowing their nature and extent.

Having concluded that the evidence sufficiently supports the findings of the jury as to the unsoundness of the mind of Inks and that appellant knew that he was of unsound mind at the time of the transactions involved; and since the evidence detailed and the findings of the jury show an inadequacy of consideration given by appellant for the property he received from Inks, we further conclude that the finding of the jury that each of the transactions in question was produced by the fraud of appellant is fully supported by the evidence.

Under the general rule, inadequacy of consideration will stamp a transaction with fraud. 20 Tex.Jur. 161. And where one of the parties is insane the rule particularly applicable here is stated in Dowlin v. Boyd, Tex.Com.App., 291 S.W. 1095, 1098, as follows: "Where the person claimed to be defrauded was insane at the time the contract was executed, such misrepresentation becomes immaterial, since the person injured, being insane, could not have been influenced thereby. If this were not the rule, the law would give greater protection to the sane person than to the insane. Where there is an inadequacy of consideration, coupled with mental impairment of the grantor at the time the instrument was executed, the transaction evidenced by such instrument is an unfair and unequitable one."

In the case of Rattner v. Kleiman, Tex. Civ.App., 36 S.W.2d 249, 251, the court say: "In the case of an insane person— that is, one who is wholly unable from mental derangement to make a binding contract—the law presumes fraud from the relative condition of the parties, the presumption being stronger or weaker according to the position of the parties with respect to each other; and if the other

party to the contract had notice or knowledge of the existing insanity, his action in concluding a bargain with the insane person, knowing of the disability, constitutes a constructive fraud which authorizes the courts to grant relief."

The jury having found that Inks was of unsound mind when he made the conveyances; that appellant knew of his unsoundness of mind; and that appellant procured the conveyances by fraud practiced upon Inks, appellee was not required to tender or offer to return the property received by Inks from Branton before being entitled to cancel or rescind the conveyances in question. This rule is agreed to by the parties, appellant stating in his brief that his complaints are "at the evidence as insufficient to support the findings of the jury" on these issues. And both parties cite the cases of Pearson v. Cox, 71 Tex. 246, 9 S.W. 124, 10 Am.St.Rep. 740, and Williams v. Sapieha, Tex.Civ.App., 59 S.W. 947, in support of the rule that under the above-stated findings of the jury, if supported by evidence, it is not necessary to plead nor prove tender or offer to tender the property received before being entitled to a cancellation or rescission of a conveyance by an insane person.

By propositions 2 and 11 appellant contends that the cause of action for cancellation and rescission of the conveyances and the alternative cause of action for damages resulting therefrom did not survive the death of Inks; and that after the death of Inks appellee could not continue to prosecute the suit without having a guardian ad litem appointed to represent the estate of Inks. Neither contention is sustained. Appellee continued the suit by amended pleadings individually, as community survivor, as the sole legatee under the will of Inks, and as independent executrix of the estate of J. M. Inks, deceased. The will had been duly probated, and she was entitled in any event to continue the suit individually and as the legally appointed representative of the estate. The provisions of Art. 2159 providing for the appointment of guardians ad litem to represent minors, lunatics, etc., when they are named as defendants in a suit, are not applicable. Art. 1994 provides that where a person of unsound mind is plaintiff he may bring the suit by next friend, which was done in the instant case prior to the death of J. M. Inks; but after his death his wife continued to prosecute the cause

individually and as the duly appointed executrix of his estate. Dowlin v. Boyd, Tex.Com.App., 291 S.W. 1095; 44 Tex. Jur. 277.

By proposition 3 appellant contends that the petition does not allege a cause of action because it is based upon the conclusions of the pleader. This proposition violates Rule 30 of the Courts of Civil Appeals, in that it is submitted as being applicable to an enumerated group of assignments of error relating to several objections or exceptions to the petition, which deal with several distinct matters. Ferguson v. Washburn, Tex.Civ.App., 4 S.W.2d 574. However, we do not regard any of the exceptions to the petition as being good, because it alleged that J. M. Inks was of unsound mind at the time he made the three conveyances to appellant; that appellant knew of his condition, and made certain false representations which induced Inks to make the conveyances, and that the conveyances resulted in appellant's obtaining a very substantial advantage; and also alleged specifically the facts as to when and how the trades were made, the value of the various properties, and what became of them.

By propositions 5 and 7 appellant contends that the court erred in refusing to give a requested general charge "that the burden of proof is upon the plaintiff to show the existence of insanity of J. M. Inks at the time the deed from J. M. Inks and Nellie Inks to J. B. Branton was executed, by a preponderance of the evidence." The case was submitted upon special issues, and the court properly placed the burden of proof upon appellee by prefacing each question with: "Do you find from a preponderance of the evidence." The law is well settled that a general charge on the burden of proof in a case submitted upon special issues is not proper. Owl Taxi Service v. Saludis, Tex.Civ.App., 122 S.W.2d 225.

By proposition 6 appellant contends that the court erred in not giving a special requested charge or instruction to the jury to the effect that if they believed from the evidence that at the time of the transactions in question J. M. Inks had mental capacity to understand the nature and effect of the transactions with the defendant, and if he did so understand they would return a verdict for the defendant; and other instructions of a like nature. The requested charge was a general charge

and objectionable for that reason; and was also objectionable because the requested instructions were clearly upon the weight of the evidence and should not have been given. Gray v. Allen, Tex.Civ.App., 243 S.W. 684. The court properly defined "mental capacity," or "want of mental capacity," and asked the jury to determine from a preponderance of the evidence whether J. M. Inks was of unsound mind as that term was defined to them in the charge. The definition of mental incapacity given and the method of submitting the issue in the instant case were approved in the cases of Caddell v. Caddell, 62 Tex. Civ.App. 461, 131 S.W. 432, and McCleskey v. McCleskey, Tex.Civ.App., 7 S.W.2d 657.

By proposition 9 appellant, in addition to contending that the evidence was insufficient to show mental unsoundness of Inks and that fraud was practiced by appellant upon him, which we have held sufficiently supported the findings of the jury, further contends that the evidence was insufficient to support the findings of the jury that the reasonable rental value of the premises during the time appellant was in possession was $1,250, and that the value of the furniture sold to appellant with the leasehold estate was $800. These contentions are not sustained. Four units of the apartment house had been rented for a total of $100 per month all but a few months for the ten years next preceding the time appellant obtained possession. The water and lights were furnished, leaving a net rental of from $75 to $85 per month. Appellant had possession from August, 1937, to October 21, 1939. This evidence fully sustained the jury's finding that the reasonable rental during a period of about two years was $1,250.

The furniture was secondhand and no market value could be shown. The kind and character of the furniture in each of the four units were shown. Appellant testified that it was worth not more than $50, or at the outside not more than $150; and that he replaced it with furniture costing "around a thousand dollars." Mr. and Mrs. Bartley, who occupied one of the units for more than ten years and knew the furniture in each of the units, testified that they examined the furniture Branton placed in the apartments and that there was "very little difference in it" and the furniture sold to Branton by Inks. This evidence sustained the jury's finding that the value of the Inks' furniture was $800.

By proposition 10 appellant complains that the court erred in appointing a receiver to take charge of the property in question pending the appeal, because appellant had filed a supersedeas bond herein. No complaint has been made to this court regarding the failure of the receiver to turn over the property to appellant after he filed his supersedeas bond; a casual examination of it shows, however, that the supersedeas bond is not sufficient in amount to cover more than the damages assessed against him by the judgment. We do not regard the matter as being before us at this time.

By proposition 12 appellant complains that the answers of the jury to the various special issues submitted are not based upon legal and competent evidence; and therefore show that the same were the result of passion, prejudice, malice and ill will toward the defendant. We have found that the answers of the jury to the various issues submitted are sustained by the evidence, and the proposition is overruled.

By proposition 13 appellant complains of the argument of counsel for appellee to the jury. Neither the proposition nor the statement thereunder shows the argument to be improper. Appellant seems to complain that because counsel referred to the fact that appellant testified that the furniture in question was of the value of $150, that he went outside the record. Branton testified that the furniture was worth $150, and counsel had the right to refer to his testimony as not showing the true value, which the jury found to be $800.

Appellant also complains that the argument of counsel was highly inflammatory and prejudicial because he frequently referred to appellant as an ex-convict. The testimony showed that appellant had been convicted on several counts in a federal indictment for receiving and concealing stolen automobiles, and given a 5-year term in the federal penitentiary, plus a fine of $1,000. He was also convicted on other counts in the indictment and given a 5-year term, which was suspended after he served the first 5 years, and a $2,500 fine; and at the time of the trial he had served most of the 5 years of the suspended sentence, and had paid the fines imposed by the court. The crimes

involved moral turpitude and the conviction of appellant was properly admitted for impeachment purposes, and the fact could be properly referred to by counsel in oral argument.

The judgment of the trial court is affirmed.

Affirmed.